UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **MICHAEL DADE and CARL DADE** | * | CIVIL ACTION NO.  12-0680 |
| **VERSUS** | * | MAG. JUDGE KAREN L. HAYES |
| **ROBERT WADELL CLAYTON, III, CRNA, ET AL.** | * | |

## MEMORANDUM RULING

Before the court are the following motions, 1) motion for summary judgment [doc. # 6] filed by defendants, Robert Clayton and American Casualty Company of Reading, Pennsylvania; and 2) motion for partial summary judgment [doc. # 22] filed by plaintiffs, Michael and Carl Dade.  With the consent of all parties, the District Court referred the above-captioned case to the undersigned magistrate judge for the conduct of all further proceedings and the entry of judgment.  28 U.S.C. § 636(c).  For reasons assigned below, the motions [doc. #s 6 & 22] are DENIED.

### Background

On August 26, 2010, Melvin Louise Dade, an octogenarian, underwent an esophagogastroduodenoscopy ("EGD") at the Endoscopy Center of West Monroe, Louisiana.  Johnny McHugh, M.D., performed the seven minute procedure, and Certified Registered Nurse Anesthetist ("CRNA"), Robert Clayton administered the anesthesia.  According to CRNA Clayton, he administered 120 mg. of Diprivan a/k/a Propofol in three 40 mg. doses during the procedure.  (Depo. of Robert Clayton, pg. 60; Pl. MPSJ, Exh. [doc. # 22-5]).  Following the

procedure, as Dade was being transferred to the recovery room, CRNA Clayton observed Dade cough, and then noticed that she had stopped breathing, with no discernible pulse from her carotid arteries. *Id.*, at pg. 83. Accordingly, Clayton and the recovery room nurse immediately began to perform CPR. *Id*. An ambulance was called, and, in due course, Dade was transferred to Glenwood Regional Medical Center. *See* Anesthesia Record, Pl. MPSJ, Exh. [doc. 22-6]. She was diagnosed with anoxic encephalopathy, which is a term that denotes brain damage caused by lack of blood flow or insufficient oxygen to the brain. (Ronald Hammett, M.D., Depo., pgs. 12-14; Pl. Suppl Memo., Exh. 3 [doc. # 49]; Defs. Answer, ¶ 11 [doc. # 6]).

On or about September 14, 2010, Dade was transferred from Glenwood Hospital to the Louisiana Extended Care Rehabilitation Center. *See* Jaya Sharma, M.D. Depo., pgs. 12-14; Pl. Suppl. Memo., Exh. 2 [doc. # 49]). Upon discharge from Glenwood, she essentially was unresponsive – her condition having failed to improve during the hospitalization. *Id*. On December 6, 2010, Dade passed away. (Frank Peretti, M.D., pg. 8; Pl. Suppl. Memo., Exh. 2 [doc. # 49]). In the three-plus months from the date of the EGD until her eventual death, Dade never regained consciousness. (Defs. Answer, ¶ 10 [doc. # 6]). Her cause of death was listed as "Pneumonia due to Anoxic Encephalopathy Complicating EGD (Esophagogastroduodenoscopy) for Esophageal Stricture." *Id*., Exh. 3; Death Certificate, Pl. MPSJ, Exh. [doc. # 22-12]).

Dade's surviving sons, Michael Dade and Carl G. Dade, retained counsel, who, in turn, convened a medical review panel to "consider the liability of Johnny Bruce Duke Mc Hugh, M.D. (Gastroenterology) and Robert W. Clayton, III, CRNA." (Opinion and Written Reasons for Conclusion; Def. MSJ, Exh. A [doc. # 6]). On February 22, 2012, the panel considered the following three questions, but unanimously answered each in the negative,

    1.      Given the classification of the patient (ASA Group 3) with all the underlying medical conditions including one lung, her age and prior issue with sedation, was it a breach of the standard of care for the CRNA to have even proceeded with the procedure at the Endoscopy Center of West Monroe?

    2.      Given the underlying medical issues, was it a breach of the standard of care for the CRNA to administer the amount of sedative during the time period he testified to?

    3.      If the CRNA did, in fact, administer the amount of medications as testified to by the EMT and reflected in the run report, would those amounts of medications over the time period as related to the EMT by the CRNA have been a breach of the standard of care?

*Id*.

The report concluded that "[t]he evidence presented does not support the conclusion that the defendants, Johnny Bruce Duke McHugh, M.D. (Gastroenterology) and Robert W. Clayton, III, CRNA, failed to meet the applicable standard of care as charged in the complaint." *Id*.

## Procedural History

Notwithstanding the unfavorable panel decision, on March 15, 2012, Michael Dade and Carl G. Dade filed the instant diversity suit against defendants, Robert Wadell Clayton, III, CRNA, Dr. Johnny Bruce Duke McHugh, and their respective insurers. The complaint seeks survival and wrongful death damages suffered by plaintiffs and/or their decedent as a result of the alleged medical practice committed by Clayton and McHugh during the course of the August 26, 2010, EGD procedure.

Within one week after suit was filed, Clayton and his medical malpractice carrier, American Casualty Company of Reading, Pennsylvania ("American Casualty"), answered the complaint, and contemporaneously filed the instant motion for summary judgment seeking dismissal of plaintiffs' complaint because plaintiffs lacked a medical expert opinion or report to

establish that CRNA Clayton breached the applicable standard of care. (Motion for Summary Judgment [doc. # 6]). In their supporting memorandum, defendants further argued that plaintiffs did not have an expert to establish causation between any alleged breach and resulting injury. (MSJ, Memo.).

Meanwhile, on April 23, 2012, co-defendant, Johnny Bruce Duke McHugh and his medical malpractice carrier, Louisiana Medical Mutual Insurance Co. ("LAMMICO") filed their own motion for summary judgment seeking dismissal of plaintiffs' claims against them. [doc. # 16]. On April 30, 2012, plaintiffs' counsel advised the court that he would not file an opposition to McHugh and LAMMICO's motion for summary judgment. [doc. # 18]. On May 11, 2012, Judge James determined that

> Dr. McHugh relies on the opinion of the Medical Review Panel to show that he did not breach the applicable standard of care. [Op. of Med. Review Panel, Doc. No. 16-6, p. 7]. In this case, Dr. McHugh's actions were not so obviously careless that a layperson could infer liability. *See* [*Id*. at 3-7]. Therefore, to establish a genuine dispute as to a material fact, Plaintiffs must present expert evidence controverting the Medical Review Panel's opinion. Because Plaintiffs have not presented any such evidence, they have not raised a genuine dispute of material fact as to Dr. McHugh's liability.

(May 11, 2012, Mem. Ruling [doc. # 19]).

Accordingly, the District Court granted McHugh and LAMMICO's motion for summary judgment and entered judgment in favor of movants dismissing plaintiffs claims against said defendants only. *Id*. On June 6, 2012, the Court certified its judgment as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). (June 6, 2012, Order [doc. # 29]). No party appealed the judgment.

Although plaintiffs elected not to contest the dismissal of Dr. McHugh and his insurer, they *did* oppose the motion for summary judgment filed by Clayton and his malpractice carrier.

4

(May 18, 2012, Response [doc. # 21]). In addition, plaintiffs filed their own motion seeking partial summary judgment "on the issue of liability and causation of the death of Melvin L. Dade as being related to and caused by the sedation administered by the defendant, Robert Wadell Clayton, III, CRNA." (May 22, 2012, MPSJ, Memo., pg. 4 [doc. # 22]).

Following several delays for supplemental briefing on the pending motions, as well as to ensure that the court enjoys subject matter jurisdiction to entertain this action, the matter is now before the court.

## Summary Judgment Principles

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is

unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.* "No genuine issue of material fact exists if the summary-judgment evidence is such that no reasonable juror could find in favor of the nonmovant." *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255, 260 (5th Cir. 2007) (citation omitted).

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

When a movant bears the burden of proof on an issue, he must establish "beyond peradventure[1] all of the essential elements of the claim . . . to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Stated differently, the movant must affirmatively establish his right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

---

[1] I.e., beyond doubt.

**Law**

I.    **Louisiana Law Applies to Substantive Issues**

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211(1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938). The parties in this matter implicitly agree that the disputed issues are governed by the substantive law of Louisiana.[2] *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007) (deferring to the parties' agreement that Louisiana substantive law controlled); *Ace American Insurance Co. v. Freeport Welding & Fabricating, Inc.*, ___ F.3d ___, 2012 WL 5077688 (5th Cir. Oct. 19, 2012) (applied Texas law where neither side disputed that Texas law applied).

To determine Louisiana law, federal courts look to the final decisions of the Louisiana Supreme Court. *Moore v. State Farm Fire & Casualty Co.*, 556 F.3d 264, 269 (5th Cir. 2009) (citation omitted).

II.    **Medical Malpractice Principles**

In a medical malpractice action, the plaintiff carries a two-fold burden of proof. *Martin v. E. Jefferson Gen. Hosp.*, 582 So. 2d 1272, 1276 (La. 1991). First, plaintiff must establish by a preponderance of the evidence that the physician's treatment fell below the ordinary standard of care expected of doctors in the same medical specialty. *Id*.[3] Second, plaintiff must establish a

---

[2] Both sides analyzed plaintiffs' claims pursuant to Louisiana law.

[3] "Nurses who perform medical services are subject to the same standards of care and liability as are physicians." *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So. 2d 654, 661 (La. 1989), *holding modified by Linnear v. CenterPoint Energy Entex/Reliant Energy*, 966 So. 2d 36 (La. 2007).

causal relationship between the alleged negligent treatment and the injury sustained. *Id.* (citing *inter alia*, LA. REV. STAT. ANN. § 9:2794). Thus, in a negligence case such as this, plaintiff has the burden to

> produce evidence from which the factfinder can reasonably conclude that his injuries, more probably than not, were caused by the negligence of the particular defendant. The plaintiff, however, does not have to conclusively exclude all other possible explanations for his injuries, because the standard is not proof beyond a reasonable doubt. Placing the burden of proof on the plaintiff requires him ultimately to persuade the factfinder concerning the defendant's negligence, and if the factfinder is undecided after all the evidence has been presented, the plaintiff loses because of the failure of his evidence. . . . The inference of negligence points to the defendant when the conduct of others is eliminated as a more probable cause.

*Cangelosi, supra*, 564 So. 2d at 664-666 (citations omitted).

"Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony." *Samaha v. Rau*, 977 So. 2d 880, 884 (La. 2008) (citation omitted).[4] Furthermore, the "requirement of producing expert medical testimony is especially apt when the defendant has filed a motion for summary judgment and supported such motion with expert opinion evidence that the treatment met the applicable standard of care." *Boudreaux v. Mid-Continent Cas. Co.*, 950 So. 2d 839, 844 (La. App. 1st Cir. 2006) (citations omitted).

## **Discussion**

In support of their motion for summary judgment, defendants Clayton and American

---

[4] For instance, "[e]xpert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence." *Pfiffner v. Correa*, 643 So. 2d 1228, 1233 (La. 1994).

8

Casualty initially argued that they were entitled to dismissal because plaintiffs did not possess requisite medical expert testimony to establish that Clayton breached the applicable standard of care, and/or that the breach of care was the cause of the anoxic encephalopathy suffered by the decedent. Defendants emphasize that the medical review panel unanimously concluded that Clayton had not failed to meet the applicable standard of care.

In response to defendants' motion, and in support of their own motion for partial summary judgment on the issue of liability, plaintiffs adduced the affidavit of CRNA Neil Buettner, Jr., in which he opined that

> based upon [his] training and experience that Ms. Dade [sic] respiratory arrest and subsequent anoxic encephalopathy was caused by the amount of sedation, choice of medications, a failure to give adequate supplemental oxygen and a failure of CRNA Clayton to properly monitor and document Ms Dade's vital signs. Base [sic] upon [Buettner's] training and experience, CRNA Clayton violated the standard of care by failing to provide adequate oxygen during and after the procedure and constant monitoring of all vital signs parameters during and after the procedure.

(Affidavit of Neil Buettner, Jr., Pl. Response to Court's Order [doc. # 40]). Defendants do not seriously contest that Buettner is qualified to render an opinion regarding the applicable standard of care for CRNAs and that Clayton's treatment fell short of that standard.[5] Thus, the conflicting findings of the medical review panel and CRNA Buettner present a genuine dispute as to a material fact that precludes summary judgment on the issue of whether Clayton breached the applicable standard of care.[6]

---

[5] In fact, a CRNA was a member of the medical review panel assigned to this case.

[6] Citing *McGlothlin v. Christus St. Patrick Hosp.*, 65 So. 3d 1218 (La. 2011), plaintiffs contend that the court should not consider the findings of the medical review panel because the panel impermissibly exceeded its authority by resolving a factual dispute between Clayton and the responding EMT regarding the amount of anesthesia administered by Clayton. Although at one point in its report the panel stated that "[t]he best evidence is the anesthesia record . . .," the

Recognizing the likelihood that Buettner's affidavit created a genuine dispute of fact that precludes summary judgment on the issue of duty and breach,[7] defendants instead re-focus their motion on the lack of expert testimony to establish that any breach of care caused Ms. Dade's anoxic encephalopathy. Defendants argue, in this regard, that a CRNA is not qualified to render an opinion on causation, and that Drs. Jaya Sharma and Ronald Hammett were unable to link any breach of care to the decedent's injury and eventual death.

The court shared defendants' concern that a CRNA was not competent to render an opinion as to causation. *See* June 15, 2012, Order [doc. # 32]. Therefore, the court directed the parties to further brief this issue. *Id*. In response, plaintiffs initially conceded that a CRNA could not render an opinion as to medical causation. (Pl. Supp. Memo., [doc. # 34]). In a subsequent brief, plaintiffs deftly reversed course, and represented, in conclusory fashion, that a "CRNA is most certainly qualified to render an opinion" as to the cause of anoxic encephalopathy. (Pl. Suppl. Memo., [doc. # 45]).

As noted by defendants, however, in Louisiana, the license to practice nursing does not include the authority to render medical diagnoses. LA. REV. STAT. ANN. § 37:913(13). Under similar circumstances, courts in other states have held that nurses are not qualified to render

---

panel further found that Clayton did not breach the applicable standard of care – even assuming that Clayton administered the amount of anesthesia as testified to by the EMT. (Med. Review Panel Opinion, Def. MSJ, Exh. A). In any event, the total amount of anesthesia that Clayton said he administered (three dosages of 40 mg. of Propofol), is less than the total documented by the EMT (two dosages of 50 mg. of Propofol). Thus, the court discerns no creditable grounds to exclude the findings of the medical review panel from the instant summary judgment record. *See* LA. REV. STAT. ANN. § 40:1299.47(H) ("Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law . . .").

[7] *See* Def. Reply Memo. [doc. # 24].

opinions on medical causation.  *See e.g.*, *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 248-49 (Tex. App. 2004); *Gordon v. Sunrise Senior Living Services, Inc.*, 2009 WL 3698527 (D. Colo. Nov. 5, 2009); *Williams v. Eight Judicial Dist. Court of State, ex rel. County of Clark*, 262 P.3d 360, 366 (Nev. 2011); *Land v. Barnes*, 2008 WL 4254155 (Tenn. Ct. App. Sept. 10, 2008); *Vaughn v. Mississippi Baptist Med. Ctr.*, 20 So. 3d 645, 651-52 (Miss. 2009).  This court is persuaded that the Louisiana Supreme Court would reach the same conclusion.

Regardless, however, the instant record contains testimony from one or more medical doctors sufficient to preclude summary judgment in favor of defendants.  For instance, by eliminating the likelihood of three other major causes of death, Frank Peretti, M.D., the forensic pathologist who performed the autopsy, opined that drugs were the most likely cause of Ms. Dade's anoxic encephalopathy and subsequent death.  *See* Peretti Depo., pgs. 12-13, 20.

Furthermore, Jaya Sharma, M.D., the hospitalist who treated Dade during her stay at Glenwood, testified that she had no reason to disbelieve that Dade's respiratory suppression was caused by sedation.  (Sharma Depo., pgs. 11-12).  She further added that sedation definitely was a consideration.  *Id*.  At times during her deposition, Dr. Sharma stated that she did not know whether Dade's anoxic encephalopathy was most probably related to sedation or not.  (Tr. 24). Nonethless, she maintained that it definitely was possible that anoxic encephalopathy was induced by sedation. (Tr. 39-40).  Dr. Sharma further agreed, akin to Dr. Peretti, that if the three other main causes of anoxic encephalopathy were ruled out, then she could not think of any other medical condition more probable than sedation as the cause of Ms. Dade's anoxic encephalopathy.  *Id*.

Finally, Ronald Hammett, M.D., the decedent's consulting pulmonologist and critical

11

care specialist, testified that his initial impression was respiratory suppression secondary to sedation. (Hammett Depo., pgs. 21-22). Hammett later testified that the only thing that *might* motivate him to change his initial impression regarding the cause of Dade's respiratory suppression was the fact that she coughed before she stopped breathing. *Id*., pgs. 46-50. Nevertheless, he explained that no subsequent tests were performed that would cause him to change or alter his initial opinion. *Id*.[8]

Construing, as the court must, "all facts and inferences in the light most favorable to the nonmoving party . . .,"[9] the undersigned finds that plaintiffs have adduced sufficient evidence for a reasonable trier of fact to find, more probably than not, that sedation was the cause of Ms. Dade's anoxic encephalopathy and subsequent death. When this evidence is coupled with CRNA Buettner's opinion that Clayton's management of Dade's sedation during her EGD procedure breached the applicable standard of care (*i.e.*, the amount of sedation that he administered, his choice of medication, his failure to provide adequate supplemental oxygen, and his failure to properly monitor and document Dade's vital signs), a reasonable trier of fact could return a verdict in favor of plaintiffs on the issue of liability. It is manifest, however, that, for their part, defendants have adduced evidence sufficient to support a jury verdict in their favor.[10]

---

[8] Although Dr. Hammett was not able to rule out at least two other potential causes of Dade's anoxic encephalopathy, it appears that he stood by his initial impression that Dade's respiratory suppression was caused by sedation. *Id*., pgs. 48-52. Further, plaintiffs need not conclusively exclude all other possible explanations for his injuries. *Cangelosi, supra*,

[9] *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted).

[10] Indeed, as defendants point out, other portions of the doctors' depositions can be read to support defendants' position on the issue of causation.

Thus, on the existing record, summary judgment in not appropriate.

## Conclusion

For the foregoing reasons,

The motion for summary judgment [doc. # 6] filed by defendants, Robert Clayton and American Casualty; and the motion for partial summary judgment [doc. # 22] filed by plaintiffs, Michael and Carl Dade, are both DENIED.

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 23rd day of October 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE